488 So.2d 992 (1986)
STATE of Louisiana
v.
Kevin M. SHOWS.
No. 85-K-0880.
Supreme Court of Louisiana.
May 20, 1986.
*993 Steven R. Thomas, Mansfield, for defendant-applicant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Don Burkett, Dist. Atty., Herman Lawson, Robert Burgess, Asst. Dist. Attys., for plaintiff-respondent.
WATSON, Justice.
This prosecution and a companion case[1] both involve the felony-firearm enhancement article, LSA-C.Cr.P. art. 893.1.[2]

FACTS
Kevin M. Shows was indicted for the second degree murder of Johnny Taylor in violation of LSA-R.S. 14:30.1.[3] At the time of the offense, on June 30, 1982, Shows was seventeen years of age. The victim, Shows' stepfather, was killed with a shotgun.
Kevin Shows is an illegitimate child who does not remember his father. He has one full sister as well as three half siblings from his mother's first marriage and two half siblings from his mother's second marriage. There were no children born of his mother's third marriage to Johnny Taylor.[4]
Shows is five feet six inches tall and weighs 120 pounds. He was expelled from school in the eighth grade and enrolled in the Job Corps but did not complete the curriculum on the advice of his grandfather. Shows' intelligence is approximately that of a fourteen year old. He is a slow learner with a schizoid personality disorder. Although he has been treated for a nervous condition, he had worked since the age of twelve and had no criminal convictions prior to the killing of his stepfather.[5]
At trial, the evidence was that Shows had a red mark on his right shoulder from the recoil of the shotgun. The body of the victim was found in the yard of his home. He was killed with three shotgun wounds: one hitting the right elbow and upper arm; *994 and the other two hitting the right arm pit and the right lower back. Two of the wounds were caused by large pellets and one by smaller pellets described respectively as "buckshot" and "squirrel shot".[6]
Shows was arrested but denied the killing until he talked to his mother on September 15, 1982. According to Shows' confession, Taylor accused him of stealing one of his guns and then pushed him to the floor whereupon Shows grabbed Taylor's shotgun. When Taylor subsequently asked for help, Shows went to a neighboring house and had an ambulance called. Taylor died before reaching the hospital.
Shows had begun having trouble with his stepfather within six months of his mother's marriage: Taylor beat his wife, Betty Taylor, Shows, and his younger brother Charles. Taylor had threatened to kill Shows many times and Shows avoided the house most of the time. Taylor was described as a big man weighing between 240 and 260 pounds and Shows was afraid of him. After Shows was expelled from school at the age of fifteen, he stayed with his grandparents in Shreveport until he joined the Job Corps. Afterward, he moved back and forth between Shreveport and DeSoto Parish.
One of Shows' half-brothers, Robert Lee Nugent, testified that there was always "threatening" in the house, but he never took it seriously.[7] On the one occasion that Taylor went after this witness, his brother, Billy Nugent, intervened.
Shows' mother, Betty Taylor, was enroute home from California when the shooting occurred. There were indications to Kevin and his mother that it would be easier on him if he confessed and he would probably be charged with manslaughter. Betty Taylor said that Taylor had pulled her hair, thrown her across the room and threatened her life. She and her children were afraid of her husband, who was a big man with an uncontrollable temper. On one occasion, she and her daughter had to hide in the woods for two or three hours to escape from Taylor. Taylor had said: "if you ever pick up anything on me, you had better use it and better kill me."[8] However, she was in love with Johnny Taylor and both of them worked. Prior to the killing, Kevin Shows and Johnny Taylor had argued a lot. Taylor once held a loaded gun to the head of his brother Leon.
Mary Schule, a former mother-in-law of Betty Taylor, testified that Kevin, Charles and Karen were abused by Taylor. Kevin once had a red knot on the back of his head where he had been hit against a wall. Kevin had stayed at her home for almost two years and Betty Taylor had also stayed on one occasion when Taylor had threatened to kill her. During the six months before the killing, Mary stopped seeing Betty Taylor because she disapproved of the way her husband was mistreating Betty and the children.
Charles Schule, who said he considered Kevin to be his grandson, said that he once went and picked up his two grandchildren and Kevin when he was called by a neighbor, Mrs. Grimsley. The children sometimes stayed two or three days. On the last occasion Schule had picked up Kevin, he stayed a year or two.
Karen Schule, aged fifteen, a half-sister of Kevin Shows, said she had seen Johnny Taylor strike her mother once or twice and on another occasion when Taylor had a gun "he grabbed her arm and they tore the back porch up".[9] She recounted the occasion when she and her mother had hidden in the woods to escape from Johnny Taylor and he searched for them with a flashlight for about two hours.
Juanita Shows Ault, Kevin Shows' sister, said she left the house because of Taylor's abuse of her mother. On one occasion, Taylor put a gun to her head and said that if she ever crossed his path again he would *995 blow her away. On four occasions, she took her mother to a friend's house for protection. Taylor also threatened her animals and everyone was scared of him. "He always told us if we picked up anything [a gun], we had better kill him".[10] Juanita Shows said that Kevin appeared to be in shock after Johnny Taylor was shot.
Charles W. Schule, Jr., another half-brother of Kevin Shows, said that he remembered Taylor striking his mother on more than one occasion and had also seen Taylor throw Kevin up against the wall. Because he did not like living with Taylor, he now lives with his father.
Billy Nugent, twenty-two, another one of Betty Taylor's children, said he was not afraid of Taylor but that Taylor and Kevin were fussing and fighting during the two weeks preceding the killing when Betty Taylor was in California. Billy once or twice thought about killing Johnny Taylor because of the way Taylor treated his mother but had no serious intention of doing so.
Rhonda McDonald, a close friend of Betty Taylor, had heard Taylor threaten Betty. He once told her that if Rhonda didn't leave, he would kill Betty. He also visited the house where Rhonda was staying and threatened her and her six year old daughter.
Pamela Nance, a friend of Kevin Shows, testified that Kevin was working at her father's outboard motor shop on the day of the killing. She customarily picked him up and took him home and did so on the day of the killing.
Kevin Shows testified that he arrived home on June 30 about 4:30 P.M. When Taylor arrived at the house, he made specific threats against Shows and his two brothers, Robert and Billy. These were different from his usual threats to the effect "that he had killed kids younger than I was [in Vietnam] and it wouldn't make no difference to him to kill me or not".[11] Taylor pushed Shows down and Shows got up and started running. When he opened the door to the kitchen, Taylor hit him in the back. Shows went into the bedroom, picked up Taylor's shotgun from the bed, and backed into a closet as Taylor came through the door. Taylor then started running toward the back door. Shows shouted Taylor's name, Taylor turned around, and Shows fired the gun. After a second shot outside the house, Taylor got up off the ground, and Shows started running, before firing again. When Taylor asked for help and Shows realized he was really hurt, he had Mrs. Grimsley call the police and an ambulance. Kevin said his memory of the killing was not completely clear. Shows said he was sorry that Taylor was dead, but he was not sorry that he had shot him and it was a "me or him" situation.[12]
In rebuttal, Terry Jones, a friend of Johnny Taylor for nearly twenty years, testified that he had never seen Taylor threaten anyone and knew nothing derogatory about him. William P. Wardell also testified to Taylor's good character, as did Otis Hammontree, who said that Taylor had a good reputation in the community and took Wardell's children hunting and fishing. Floyd Smith also testified that Johnny Taylor was an agreeable, good man.
After the jury had been charged by the court, they decided to defer their deliberation until the following morning. At that time, Shows withdrew his former plea of not guilty of second degree murder and pleaded guilty to manslaughter.[13] Shows *996 was advised that the maximum sentence was twenty-one years at hard labor.[14]
At the sentencing hearing, James Nance, who said he had had a close relationship with Kevin Shows, testified that he could offer Shows a home and a job working on small engines if he were placed on probation. His daughter, Pamela Nance, testified that Kevin Shows was a happy-go-lucky person without any violent tendencies who would be unlikely to repeat his crime. Charles Schule, who regarded Kevin as a grandson, testified to the boy's difficult life.
The court stated that probation was not justified but something less than a maximum sentence was indicated. Because a firearm was used in commission of the offense, the court invoked LSA-C.Cr.P. art. 893.1. Kevin Shows was sentenced to eleven years at hard labor without suspension of sentence or eligibility for probation/parole.

LAW
State v. Kennedy, 480 So.2d 299 (La., 1985) held that defendant was not prejudiced by lack of formal notice of sentencing under LSA-C.Cr.P. art. 893.1, because he and his counsel were fully aware that the district attorney intended to press for enhancement.
State v. Coleman, 465 So.2d 709 (La., 1985) held that the mandatory language of LSA-C.Cr.P. art. 893.1 does not require automatic enhancement absent action by the prosecutor. The article is not self-operative nor imperative. Coleman indicates that Art. 893.1 must be invoked by the district attorney's office. A sentence which does not apply enhancement is not illegal and subject to correction by the trial court under LSA-C.Cr.P. art. 882.[15]
State v. Jackson, 480 So.2d 263 (La., 1985) held that LSA-C.Cr.P. 893.1 is a sentencing statute. In cases tried after Jackson, December 2, 1985, the penalty enhancement provision of the article can only be invoked when the accused receives written notice in advance of trial by the prosecutor. Except in instances where there is unfair prejudice to the defendant, the Jackson rule is only prospective. Like Coleman, Jackson indicates that enhancement must be sought by the district attorney, because the judge's role is that of an impartial arbitor who makes the finding that a felony was committed with a firearm.[16] Actual prejudice to Jackson was found.
State v. Harris, 480 So.2d 281 (La., 1985) held that the defendant had actual pretrial notice of the state's intention to prove firearm use and was not prejudiced by application of Article 893.1. Harris decided that article 893.1 is applicable to all felonies, *997 including manslaughter, one of those enumerated in LSA-R.S. 14:95.2.[17]
State v. Hogan, 480 So.2d 288 (La., 1985) also held that the defendant had actual pretrial knowledge of the state's intention to prove firearm use and therefore there was no particular prejudice. Like Harris, Hogan held that the specific enhancement in LSA-R.S. 14:95.2 for use of a gun in ten specified felonies does not foreclose enhancement under Article 893.1.
In State v. Barberousse, 480 So.2d 273 (La., 1985), defense counsel requested a jury charge on article 893.1 and stated at the sentencing hearing that the defendant understood the court intended to apply the article. Thus, the defendant had actual notice that the state's evidence included proof of a firearm felony and he would be subject to article 893.1.
State v. Street, 480 So.2d 309 (La., 1985) held that Art. 893.1 is inapplicable when the use of a weapon is an intrinsic part of the underlying crime.
In State v. Delcambre, 480 So.2d 294 (La.,1985), Delcambre was advised when he pleaded guilty that he could receive a maximum sentence of twenty-one years at hard labor but was not told until his sentencing that Article 893.1 would be applied. The trial court, by indicating at the time of the guilty plea that a suspended sentence was possible, implied that LSA-C.Cr.P. art. 893.1 would not be applied. Therefore, article 893.1 enhancement was illegally prejudicial.

CONCLUSION
Shows' trial commenced on January 30, 1984, nearly a year before the Jackson decision. Although there is no question that the felony was committed with a firearm, the grand jury indictment did not mention that fact. There is no indication in the record that the prosecutor requested enhancement of the sentence under LSA-C. Cr.P. art. 893.1.
The penalty for manslaughter is imprisonment at hard labor for not more than twenty-one years. If the trial court had not invoked LSA-C.Cr.P. art. 893.1, Shows' sentence would have been with the benefit of possible suspension of sentence and eligibility for probation or parole. Unlike the defendant in Delcambre, Shows was not misled by the trial court at the time of his guilty plea into thinking that suspension of sentence or probation was possible. On the other hand, in contrast to the Kennedy defendant, Shows was never aware that the prosecutor intended to ask for enhancement under LSA-C.Cr.P. art. 893.1. The testimony of James Nance at the penalty hearing indicates that Shows' counsel was also unaware that probation was not a sentencing option.
According to Shows' confession and his testimony at trial, he could have avoided shooting his stepfather and did not have a valid plea of self-defense. Shows also admitted that he did not regret shooting Taylor. Under the circumstances, manslaughter was undoubtedly the most lenient verdict which Shows could reasonably have expected from the jury. Thus, it is unlikely *998 that his guilty plea was influenced by any other consideration than the possibility of a greater verdict. Actual prejudice, in the sense of an inducement to plead guilty, was not present. However, both Coleman and Jackson indicate that enhancement must be sought by the prosecutor rather than invoked by the trial court, as it was here.[18] According to Coleman, the district attorney can elect to waive enhancement of a sentence.[19]Jackson makes the same point, emphasizing "both the judge's impartial role and the district attorney's constitutional right to control every prosecution in his district".[20]
The trial court stated that the mitigating circumstances justified something less than the maximum possible sentence of twenty-one years, but then indicated that it felt bound to apply LSA-C.Cr.P. art. 893.1, repeating the mandatory language of the article and stating:
"Accordingly, Court does find that a firearm was used in the commission of the felony and that that article is applicable here and no probation and no parole provisions will be applied in this case."[21]
It appears from the record that the trial court felt bound to invoke LSA-C.Cr.P. art. 893.1, although application of the enhancement statute is not mandatory. Coleman, supra. Since there is no indication that the prosecutor at any time requested enhancement under LSA-C.Cr.P. art. 893.1, the conviction is affirmed and the sentence amended to delete the "without benefit"[22] provision.
AFFIRMED AS AMENDED.
DENNIS, J., concur with reasons.
LEMMON, J., concurs.
DIXON, C.J., dissents.
CALOGERO, J., dissents and assigns reasons.
CALOGERO, Justice, dissenting.
The majority opinion mistakenly relies on State v. Coleman, 465 So.2d 709 (La.1985), to grant this defendant relief. Although the Coleman decision emphasizes the District Attorney's constitutional authority to "determine whom, when and how to prosecute," including whether to seek enhancement of a sentence to the full extent of the law, the holding in that case only prohibited a trial judge from imposing the provisions of La.Code Crim.Pro. art. 893.1 following a motion by the District Attorney which came only after execution of the sentence had begun. It did not address the trial judge's right to apply art. 893.1 in sentencing without the D.A.'s request in advance that he do so.
It was our decision in State v. Jackson, 480 So.2d 263 (La.1985), which extended the Coleman holding and only prospectively dictated written notice from the prosecutor, in advance of trial, that the state intends to invoke art. 893.1. In Jackson and the related case, State v. Delcambre, 480 So.2d 294 (La.1985), however, we carved out an exception to the merely prospective application of the procedural rule concerning art. 893.1 notice, in cases where the defendant has suffered some special prejudice by the absence of pre-trial notice. Delcambre, who would not have benefited from prospective application of the art. 893.1 Jackson notice rule, had pled guilty upon misadvice (that sentence would be with benefit); he would thus have been prejudiced by allowing the art. 893.1 restriction on parole or probation. He therefore got relief.
*999 Jackson also got relief because he virtually pled guilty by waiving jury trial and stipulating to the evidence after the trial judge found evidence at preliminary hearing sufficient only to support manslaughter. Furthermore, Jackson's case was pregnant with the possibility of an acquittal or lesser conviction than manslaughter. He was not alerted to the fact that his manslaughter sentence (17 years was actually given) would be with restrictions on parole, probation or suspension of sentence.[1]
Shows was not misadvised. He simply was not told that he would face an art. 893.1 restriction. And he did not plead in anticipation of parole or probation eligibility, but rather to avoid a conviction on the greater offense of second degree murder. He was thus not prejudiced by the lack of pre-trial notice of the pending application of art. 893.1's restrictions on the judge's sentencing discretion. As stated in this majority opinion:
According to Shows' confession and his testimony at trial, he could have avoided shooting his stepfather and did not have a valid plea of self-defense. Shows also admitted that he did not regret shooting Taylor. Under the circumstances, manslaughter was undoubtedly the most lenient verdict which Shows could reasonably have expected from the jury. Thus, it is unlikely that his guilty plea was influenced by any other consideration than the possibility of a greater verdict. Actual prejudice ... was not present.

Accordingly, Kevin Shows is not entitled to the retroactive application of the notice rule established in State v. Jackson. Although I believe that the trial judge properly imposed art. 893.1's limitations on the availability of parole, probation, or suspension of sentence, were my view to prevail it would remain for this Court to decide the issue which in fact prompted the grant of this writ, and that is, whether the limitation on parole, probation or suspension dictated by art. 893.1 is applicable to the entire eleven year sentence imposed on the underlying offense or merely to the first five years of the sentence.
NOTES
[1] State of Louisiana v. Otis Moore, 488 So.2d 987 (La., 1986). Although consolidated for argument, the two cases turn on different issues. Moore also involves the application of LSA-R.S. 14:95.2 and separate opinions are being rendered.
[2] LSA-C.Cr.P. art. 893.1 provides:

"When the court makes a finding that a firearm was used in the commission of a felony and when suspension of sentence is not otherwise prohibited, the court shall impose a sentence which is not less than:
"(1) The maximum sentence provided by law, in the same manner as provided in the offense, if the maximum sentence is less than five years, or
"(2) Five years, in the same manner as provided in the offense, if the maximum sentence is five years or more.
"Imposition or execution of sentence shall not be suspended and the offender shall not be eligible for probation or parole."
[3] LSA-R.S. 14:30.1 provides:

"Second degree murder is the killing of a human being:
"(1) When the offender has a specific intent to kill or to inflict great bodily harm, or
"(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, aggravated arson, aggravated burglary, aggravated kidnapping, aggravated escape, armed robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm.
"Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence."
[4] Kevin's mother, Betty Taylor, said she had eight children rather than seven and had been married four times.
[5] Shows subsequently escaped from the DeSoto Parish jail and pled guilty to simple escape, a relative felony. His friend, Pamela Nance, testified:

"When he called me, it was early in the morning and when I picked him up, I had already called the law because I knew what he had done was wrong. And if the law hadn't been there, I felt sure he would have let me bring him back to jail on his own." (Tr. 546)
The state agreed not to prosecute on a pending charge against him of theft of over $500.
[6] Tr. 259.
[7] Robert Lee Nugent is facing a penitentiary term as a convicted felon.
[8] Tr. 377.
[9] Tr. 403.
[10] Tr. 410.
[11] Tr. 441.
[12] Tr. 304.
[13] LSA-R.S. 14:31 provides:

"Manslaughter is:
"(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or
"(2) A homicide committed, without any intent to cause death or great bodily harm.
"(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Articles 30 or 30.1, or of any intentional misdemeanor directly affecting the person; or
"(b) When the offender is resisting lawful arrest by means, or in a manner, not inherently dangerous, and the circumstances are such that the killing would not be murder under Articles 30 or 30.1
"Whoever commits manslaughter shall be imprisoned at hard labor for not more than twenty-one years."
[14] "The maximum penalty is this: Whoever commits manslaughter shall be imprisoned at hard labor for not more than twenty-one (21) years...." (Tr. 534-535)
[15] LSA-C.Cr.P. art. 882 provides:

"A. An illegal sentence may be corrected at any time by the court that imposed the sentence or by an appellate court on review.
"B. A sentence may be reviewed as to its legality on the application of the defendant or of the state:
"(1) In an appealable case by appeal; or
"(2) In an unappealable case by writs of certiorari and prohibition.
"C. Nothing in this Article shall be construed to deprive any defendant of his right, in a proper case, to the writ of habeas corpus."
[16] State v. Byron Fraser, 484 So.2d 122 (La., 1986), notes that: "the appearance of an impartial judiciary is not served when an appellate court supplies an objection to the prosecutor who has not complained that the defendant did not receive the harshest minimum sentence under the penalty statute." 484 So.2d 122 at 125.
[17] LSA-R.S. 14:95.2 provides:

"A. Notwithstanding any other provisions of law to the contrary, any person who uses a firearm or explosive device at the time he commits or attempts to commit the crime of second degree murder, manslaughter, aggravated battery, simple kidnapping, aggravated escape, aggravated burglary, aggravated arson, attempted aggravated rape, attempted first degree murder, or attempted aggravated kidnapping shall upon conviction serve a term of two years imprisonment for the first conviction and upon conviction for each second and subsequent offense listed in this Section, he shall serve a term of five years imprisonment.
"B. The penalty provided herein shall be in addition to any other penalty imposed under the provisions of this Title and such person shall serve the additional term of imprisonment in the same manner as provided in the offense for which he was convicted and without benefit of parole, probation, suspension of sentence or credit for good time and any adjudication of guilt or imposition of sentence shall not be suspended.
"C. The prison term provided under the provisions of this Section shall run consecutively to any other penalty imposed upon conviction of any of the crimes listed in this Section."
[18] "The State made no sentence recommendations in connection with allowing the defendant to change his plea to guilty of manslaughter...." (Tr. 550)
[19] Here, the state's brief admits that: "The Court ... invoked the provisions of Code of Criminal Procedure Article 893.1, ..."
[20] 480 So.2d at 271.
[21] Tr. 557.
[22] LSA-C.Cr.P. art. 893.1 provides in pertinent part:

"Imposition or execution of sentence shall not be suspended and the offender shall not be eligible for probation or parole."
[1] In State v. Kennedy, 480 So.2d 299 (La.1985), this Court denied relief to a defendant, who had pled guilty without pre-trial notice of the pending application of art. 893.1. In failing to find prejudice to Kennedy from the lack of notice, we noted that his guilty plea was induced by substantial concessions made by the D.A. in return for the guilty plea and that he had in no way been misled into pleading guilty on assurances that his sentence would not be enhanced. Furthermore, when the defendant pled, he and his attorney were fully aware that the D.A. intended to press for the sentence to be imposed "without benefit."